et al. I don't know. Yeah, you asked for it. Yeah. I need to bring this to this place. Yeah. And she didn't like this almost too much. Yeah. Yeah. Yeah. Good morning. Good morning. May it please the court, my name is Jeffrey Moorhead, I'm from the Virgin Islands. I represent Appellant Shango Allick. However, I'm here today arguing on behalf of all of the appellants. And with the consent of the court, I would reserve four minutes in rebuttal. That's granted. Thank you very much. And this is an interesting case. We may go over time here, so take the time you need. Okay. I always have a tendency to speak fast, so it's nice to hear that. I hope you're enjoying our good weather. I got a haircut before I came out here. My head's freezing. But it's nice. It's my first time here before the court. I'm already going hoarse, but it's a pleasure to be here. All right. Well, I'm happy to have you here. I think, Judge, we'd like to go down to the Virgin Islands, but we're happy that you're able to come speak to us here. Yes, Your Honor. This case is very fact-specific, so I may be spending more time than usual addressing the record with regards to the facts and non-facts than I normally would in the Court of Appeals. And very soon you'll see why. This case was a 22-page indictment alleging money laundering conspiracy and aiding and abetting. There were, at the beginning, some 18 defendants. It got whittled down to 10 at the time of trial. Six of the 10 defendants were also charged with drug conspiracy. Alec was only charged with money laundering conspiracy and aiding and abetting. In any event, trial began January 31st of 2006, and it ended abruptly on February 17th. No, it went to the jury on February 17th of 2006. The first note came from the jury on... The 17th would have been a Thursday? On trial, I believe so, because there was a weekend, and then they really started deliberating on the 22nd of February. It's over a year ago. I can't remember. The only thing I do remember is that the mistrial was declared on the afternoon of a Friday, and that was Friday, February 24th. All right, thank you. So when I sit down, I'll do the math, and I'll tell you the exact date. I'm sorry. I think we have the jury deliberating from the 17th to the 24th. Yes. All right. On the 22nd of February, a series of three notes came to the jury. The first one around 10 o'clock. The jury asked a question. The judge, as is required by law, summoned all the attorneys into the court and shared the note from the jury foreman with the defendants. Discussions were had on the record, and the parties agreed on a response. The court wrote the response and sent it back to the jury. About 10.55, a second note came in. It's not important what it was. What's important is that the first and second note were both signed by the jury foreman only. The judge, again, brought the defendants into the courtroom, shared the note with all the defendants. On the record, there was discussion. The parties agreed on an appropriate response. Before the response could be sent back to the jury, a third note came. Again, we were already in the court. The court, Judge Finch, shared the note with the jury, with the defendants, on the record, and the parties agreed, discussed and agreed an appropriate response. The response was sent to the jury. That was on February the 22nd. Three notes, all of which came signed only by the jury foreman, discussed in open court, shared with all the defendants, discussions on the record. It goes back to the jury. Two days passed, and on February the 24th, which is a Friday, around 11 or 11ish, a note came from the jury. The final note came from the jury foreman. Excuse me. The fourth note came from the jury foreman, and the note said that, specifically, the note, I'll put a quote here, but the note basically said, we, the jury, after careful... Yeah, I think it says, I have a quote, after considerable deliberation, we, the jurors of this case, are presently in a deadlock, period. We await for further instructions or information regarding this case, period. Exactly. And the language of that note is important for several reasons. Number one, it's signed only by the jury foreman. Number two, the language states that we are presently at a deadlock. It does not say that we are hopelessly deadlocked. The last sentence is even more important, because after three notes from the jury foreman, who represents the jury, going to Judge Fentz, the jury states, we await further instructions and information, and it's signed by the jury foreman. The record after that is very clear what happens. The record after that. All of a sudden, we have the court calling the parties into the courtroom, where the following colloquy took place, and I will attempt to read the question and answer with the speed at which it went by, but there's no way to accurately do that. Now, wasn't there a meeting in chambers at that point? When the jury... I could answer that question twofold. I could tell you what's on the record, and I could tell you what my recollection is. What my recollection is is going to cause a lot of confusion, but I'll answer your question. Well, I'm not asking for the content of the chamber's conversation. I'm just saying that according to the arguments in the briefs, the judge met with counsel in chambers after giving counsel a copy of the note. The meeting was about ten minutes long. It wasn't recorded. Murad's counsel wasn't there, and then there was a lunch recess. I will agree that Murad's counsel was not there. I will also agree that Isaiah Fox's counsel was not there. He was on his way to Trinidad and left another attorney in charge. And I will agree, and I will tell you as an officer of court, that there was a meeting, informal conference, whatever you want, if you will, in Judge Finch's courtroom. Courtroom or chambers? In chambers. Chambers, and not on the record? Chambers. Not on the record in chambers. The first three were in the court on the record as required by Rule 26.3. And then there was a proffer as to what happened there, but that was been objected to. The proffer, I think, was a slick maneuver by the attorney general to create a record which did not exist. It was a slick maneuver by the attorney general to make the defendant's counsel witness against his own client in some cases. It was also a slick maneuver to test everyone's memory and to create confusion. I say that because we don't know whether or not, and I can't recall, it's over two years, I can't recall whether the judge actually stated, I will declare a mistrial. I can't recall whether the court said, I think they're tired. I'm inclined to declare a mistrial. But the court did share the note with those who were present. I'm not sure who all was there. No defendants were there. And Attorney Marat's client, Attorney Marat, was not present. She did have notice, though, of it. She chose not to go. I really can't speak to her. I don't know if she didn't get there in time. It was a non-defendant case, and it was not easy getting everybody together. When we were waiting on the jury, we had most of the defendants waiting across the street at the subway. But she was, I remember that she was not there. But isn't it true, though, that even she found out about the gist of the, it's unfortunate we don't have it recorded here. We wouldn't have to be talking about our memories and who said what. But didn't everyone know that a mistrial was in play? I mean, it was in the judge's mind? I can't answer for her, but I know that a mistrial was in play, as you stated. The Office of the Court had to say that because Judge French shared the note with those that were there, passed it around. I remember looking at it, but there's no record to say exactly what was stated. I think he said something along the lines, and I'm getting there. I don't want to go there. But the mistrial was in play, Your Honor, to use your words. I can't recall if he said, I'm going to declare a mistrial if they're tired, or I'm inclined to declare a mistrial, or let's have lunch and come back, or whatever. I really, really, really cannot honestly tell you exactly what was said. And that's a problem when you don't have a record. You don't have the length, the breadth, the context. We don't have anything except self-serving members. All right, but then there was a lunch recess, and then they all go back to the Supreme Court. Those who were there left. There were no defendants in Judge French's courtroom. We left. I don't know how long. The lunch was more than 10 minutes long. I can't hold me on exactly how long it was. But we came back into the courtroom, and the corollary is in the brief. It's on page 5 of the appellant's brief. And it goes like this. The court, good afternoon, ladies and gentlemen. The jury, good afternoon. The court, I understand that Mr. and Carl Schoen, you are the jury foreman. Is that correct? The foreperson, that's correct. The court, I have the note signed by you. My question is this. Whether or not this note would respect your inability to reach a verdict applies to all defendants and to all charges. The foreperson, yes, it applies to all defendants. The court, very well. Counsel, there being nothing else, I will declare a mistrial. Now, I tried to read that as best I could in the manner in which I recall Judge Finch speaking, the speed at which he spoke. And the reason I do that is just to drive home the point. When your Honor states, and Judge Polak, you try cases every day. When the court says, counsel, there being nothing else, I will declare a mistrial. That's less than a second. You have less than a second to decide. Am I going to jump up as if this is a fish market on a Saturday afternoon and shout out in front of the jury at the most crucial point in the trial that I have an objection? Do I expect the court to bring us a sidebar as he did for the prior five weeks to discuss these types of matters? Am I to wait for the judge to go down each defendant as he did? Whenever we had an objection, he would start with Fox. He would go to Mora, Alfred, Garcia, Allen, in the manner in which you were indicted, soliciting responses from each one. That didn't happen here. If you read the transcript, I'm sure you have, any time there was, he invited discussion or things to be put on the record, he would go down in that order. That didn't happen. That didn't happen on February 24th. All right, what happened next? We have Judge Thompson then. Before we get to Judge Thompson. We have another indictment. Before we get to Judge Thompson, we have some very interesting events. After the 22nd, the mistrial was declared. The mistrial was declared on February 24th on Friday afternoon. First thing on Monday morning, on behalf of Isaiah Fox, on behalf of Shango Alley, I filed a notice. My time is up, I can continue. Yes. I didn't even notice it. No, it's all right. We'll give you another five minutes. Thank you. Before we go there, after the mistrial is called, the judge then started talking about a retrial date, right? I don't see anything objecting to that. No, but I took the position once the mistrial was declared, you can't undeclare it. I've never seen that done. Everyone was just basically sitting there. The judge saw his way out, he has his hands on the doorknob, that's not on the record. And one of the attorneys says, judge, can we speak to the jury? And he responds and he leaves. And the jury, he backs the jury and the jury is dismissed. The entire co-op, he's right there, it doesn't take very long. But after the Friday, immediately on Monday morning, Alec files a notice of appeal. The government takes the position that that's not timely enough because you should have jumped up on Friday afternoon. We take the position that you have 10 days to file a notice of appeal. And the notice of appeal is just as good after nine and a half days as it is after nine seconds. So that's a non-argument right there. Additionally, Alec appealed, to make a long story short, he appealed the imposition of a mistrial without his consent. That was dismissed by this court because it wasn't a denial of a motion to dismiss on double jeopardy grounds. But it brought the defendants a year. So the case comes back to the district court. The case is that a motion to dismiss is then filed and is granted by Judge Finch on September the 5th. And what he says on September the 5th is very, very important. It says, basically grants the defendants motion to dismiss on double jeopardy grounds and he recuses himself. Now, the government would have believed that the recusal only goes to the second indictment. But the recusal actually went to the first indictment. Because if you look at the appendix on page 170 of the appendix at the bottom, the government and the judge are talking about the lack of a record of a dual 26.3 hearing and the record. And they're going back and forth. And the judge at the bottom of page 170, our appendix, the court says that has to be measured against noncompliance with the rule. Judge Finch is admitting he did not comply with rule 26.3. Mr. Andrews says against what? The court says noncompliance with the rule 26. In any event, I'm recusing myself from this case. A visiting judge will take it over. Judge Gomez cannot. He was involved. He was a U.S. attorney at the time. So Judge Finch recuses himself from the first indictment despite the fact that the order says 07 at the top. He's discussing the trial in the first indictment when he recuses himself. That's important because after he dismisses the 05 first indictment, the government appeals. But before the appeal can be docketed, the government must dismiss its appeal pursuant to rule 46A or whatever it is. And it's granted by the same judge who recused himself. That's a fatal error because on the circuit, any judge who recuses himself from a case is completely forbidden from doing anything else except for administrative matters and preparing the case for the next judge. That's Moody v. Simmons, third circuit case. And that's Selfridge v. United Omaha Insurance, third circuit case out of Virgin Islands. So my point is, after Judge Finch recused himself on September the 5th, after he granted the motion to dismiss with prejudice, he comes back on October the 18th, vacates it, and then recuses himself again. In addition to dismissing the appeal to the government opposition, he had no authority to dismiss the appeal on the government's motion because he had already recused himself. Therefore, the motion to dismiss with prejudice should still stand with regards to 05, the first indictment. Now, getting along to Judge Thompson, Judge Thompson. You're saying that somebody who recuses himself can't vacate that order? That's exactly what I'm saying. That's what the third circuit and all the case law says, except there are always exceptions to every law, Judge. And the exception being that the judge can make certain orders that makes it administrative orders, sending the case to where it's being assigned to. The judge cannot come and unrecuse himself. And that's exactly what Judge Finch did on October the 18th when he vacated the September 5th order, dismissing it with prejudice. And he did two things after September 5th. He dismissed the government's motion on appeal, since it was not yet docketed, which he could have had he not been recused. And he also vacated the September 5th order. Moving along to Judge Thompson. Judge Thompson came in on October 31st without a hearing, and all of a sudden we have a caption that has both the first and the second indictment. And she grants the motion. She denies the motion to dismiss on double jeopardy grounds. But she does not dismiss it on the issue of whether or not there was consent. She dismissed it on the grounds of manifest necessity. And our position is that she did not go through the requirements of U.S. v. John, the four requirements that the Supreme Court acts that the court looked at when dismissing cases with manifest necessity. Of course, the court knows that you have to hear the plaintiff's party in regard to the mistrial. You have to consider alternatives. That's U.S. v. Perez, which is also Verzon's case that was just handled two years ago, which I argued whether or not the court acted deliberately or abruptly. So the court, Judge Thompson, denied the motion dismissed on double jeopardy grounds. Not on whether or not there was consent, but on manifest necessity, which makes your job much more easier. And she did not follow U.S. v. Perez. She did not follow U.S. v. John. She basically, in her motion, and I'll finish my thought, pointed to the government's proffer, what the government said in its proffer. And that's not indirect. She pointed to what the government said in its proffer. Thereafter, according to the proffer, the trial judge met with counsel in chambers, as he did with the three prior notes from the jury. To indicate he would have to declare mistrust. So Judge Thompson's entire order is based primarily on the proffer, not the record. And the proffer had been objected to prior to that time. No. One attorney responded to the proffer. Most of us didn't respond to it because it didn't. I thought Virgin and Murag had filed an opposition on October 5th. Yes, they did, but there were seven other defendants who just completely ignored it. Additionally, the motion to proffer was not acted upon by the court. It's always been my position that a proffer is something when the judge says, well, what's the evidence going to show if I let Mr. X testify? That's a proffer. I've never heard a government, a United States attorney, submitting a proffer in lieu of a record. And that's what we have here. All right, let me ask a question as to what would be barred if we were to find the mistrial was improperly declared. The conspiracy counts would be barred from the 2007 indictment. But wouldn't the money laundering charges be permitted to proceed? Our position is that everything would be barred, despite the Supreme Court cases which deal with double jeopardy. With the mistakes the government made here in the first indictment, they only charged conspiracy to money laundering, aiding and abetting. But as their operative fact, they included promotion of laundering, concealment, which they did not have to do. But if money laundering, the substantive count, was not charged in the first indictment. I understand that. I mean, it necessarily has different components than a conspiracy. Would that not be permitted to proceed? Except when the government proves that it's operative acts elements dealing with money laundering. If they had completely left that out, they didn't need that for money laundering conviction. But they used as their operative acts promotion and concealment. Somebody in Alaska making false ID, wiring money to the Virgin Islands. People in the Virgin Islands picking up money for John Doe, giving it to John Doe. The government didn't have to prove those things to prove conspiracy. Those are overt acts dealing with money laundering. And they proved those things or they tried to in the first case.  And that's the distinction. That's the distinction. I understand that they're different elements. And I understand it's not the totality of the circumstances. So you're saying it's enough that they avert this conduct as overt acts? In the indictment, and they spent four weeks in trial trying to prove those things, and they failed. Had they not done so, we would not have a double jeopardy argument on that. That's Whitefield v. United States. 5403 United States 209. It's a 2005 Supreme Court case. And it basically says, conviction for conspiracy to commit money laundering, Section 1956H, does not require proof of an overt act in furtherance of a conspiracy. The government tried to do it anyway. So they can't have the cake and eat it too. All right. We'll hear from you on rebuttal. Thank you. Thank you. I'm sorry for speaking so fast. Is that all right? All right. May it please the court. My name is Alfonso Andrews. And I'm an assistant justice attorney from the warm district of the Northern Islands. And I'm here to represent the United States, the appellate. Permission to proceed? Yes. Your Honor, the key issue before this court is whether or not the appellate consented to the mistrial declaration. Well, the court below did not even talk about consent. Judge Thompson ruled based upon manifest necessity. That is true. That is true, Judge Randolph. And I would submit to this court that this court may not even reach the issue of manifest necessity. Well, we will need to address it. We're not going to go on to an alternative ruling unless we find, I mean, arguably we might go to alternative ruling. But we're not going to do that unless we find there was no manifest necessity. Then we'd need to look at consent. Fair enough. Then let's talk about manifest necessity. I think we should because that's the order. And if we find there was no manifest necessity, then I guess we'd have to look and see whether there's enough here for us to find consent. Okay. We would submit to the court, Your Honor, that there was manifest necessity justifying the mistrial in this case. And I would ask the court in making that determination to do so while giving deference to Judge Finch's decision that a mistrial was necessary. Because this is not a case in which the government requested a mistrial. This is not the type of instance in which the mistrial was declared, let's say, for the benefit of the government. What basis do we have for deferring to Judge Finch's ruling when we don't really know what it was? It's Judge Thompson's ruling that's before us, is it not? That is true, Judge Pollack. But I think the state of the law is that this court can uphold a filing of manifest necessity if such a filing is supported by the record. I think the case law is also clear. Did Judge Finch say anything about manifest necessity? No. But what he did say in his order is that in light of the jury being deadlocked, he's declaring a mistrial. That's what his order said. It was a very short order. But don't we have case law that says we really need to understand how deadlocked? In other words, we need to know whether further deliberations would be worthwhile. We need to know how the jury is perceiving this through polling or through asking the foreman. Especially when the note here says we are presently deadlocked, we await further instructions or information. Doesn't that say that they're not giving up entirely and that it would be useful for some further communication with them? It may appear that way, Judge Reynolds, if we were to focus only on the note. I would suggest, however, that the totality of the circumstances is what the court should look at because those are the circumstances that Judge Finch was facing. All right. What are those circumstances that make it necessary? A circumstance in which the trial, although it spanned approximately two weeks, there were really only nine trial days. And the record supports that. We also have a situation where the jury deliberated for five days. Now, maybe not necessarily the full blank from eight to five each day, but it was five different days in which the jury deliberated. The issues were not all that complex. There clearly was evidence with respect to the finance cashing of wires. And the real issue really was whether or not they knew that the monies that they were cashing represented drug proceeds. I mean, there were other issues as well. But I would say the case was not overwhelmingly complex. Besides that, we have a situation where the jury came back to the court with three different notes before we get to the fourth note. Pardon me, were you trial counsel? Yes, I was trial counsel, Judge. And so they came back and they're telling the court after five days of deliberation, after submitting three notes for which the court responded. Judge, we, after considerable deliberation, and I think the four persons use of the term considerable should be given some weight. It's telling the court essentially we've had enough. We are present in the deadlock. And sure, they ask, well, we await further instructions. There was no Allen charge given, was there? No, there wasn't. But the court did meet with counsel, and even my co-counsel here conceded. And if we get to that point, I'll show you where there's ample evidence in the record to support the existence of that conference, to support the fact that the lawyers were made aware of the note with respect to them being deadlocked. And more importantly, to support the conclusion that the judge indicated in chambers that he was going to grant a mistrial. So this is no surprise. But that's not a matter of record. That's not a matter that we have from the record of the district court, is it? Well, with all due respect, Judge, there is evidence in the record that supports that. First, there is a proffer submitted by the government which none of the appellants has objected to with respect to the facts of it. But that proffer is, when was that prepared and submitted? What happened is it was filed in conjunction with the government's motion for reconsideration prior to Judge Thompson's ruling. Two defendants filed oppositions to it. But when we say opposition, you need to look at those oppositions. Inside of it, one of them basically said, well, Judge Thompson wasn't there. And since it wasn't recorded, you shouldn't consider it. That was the nature of the oppositions. If you read the oppositions, none of them say the conference did not occur. None of them say we were, one of them said it wasn't chambered. None of them say that the judge did not announce his intent to grant a mistrial. The proffer then was six or seven months after the trial, after the dismissal? Yeah, from February to October. Yes, yes. It was submitted on October 1st, 2007. It was in 2007. Actually, it was more than a year after the trial. Eight months. Because the trial was on time in February. But with respect to what's in the record, you also have a concession by counsel for Young. Counsel for, which is Scott Machin, for Garcia. I mean, he said it right in his, I think the court can easily consider it as a judicial admission. In his, I'm looking now at page 154 of the appendix, which is the transcript of the September 5th hearing. This is Scott Machin on behalf of Garcia to the bottom. He says, there were discussions that were held with regard to mistrial. Whether the defendants were for or against it. Whether the government was for or against it. And you go over to the next page, he says, and it was in my recollection an informal discussion of mistrial. And I submit to the court that the concessions, so to speak, by the attorney for Young are more than that. It's more of a confession. He says, if you go to page 158, he says, and I'm looking, yeah, I'm sorry, I'll go back to 157. He says, it is not what I'm here, I'm here working for my client. I'm not hoping, okay, well, it looked like we're going to have a hall jury. We've been in here too long. So let's go along with the flow and have another trial. And then he comes back to the end and he says, when I look back at the total circumstances, I never made any objections to it. Because I believe that the court had left in mind that it was going to be a mistrial. So he says, and then he says, and now that I have reviewed the law, I'm watching and I'm saying, could I have done more? It seems that way. And so I'm saying that to say that there is evidence in the record separate from the government's proffer that there was an in-chambers hearing. There was a mention of the mistrial. And most importantly, none of the defendants uttered a word of objection. None of them suggested that we continue deliberation. Even though they had an opportunity. So, with respect to the manifest consistency argument, I'm saying that to say that the court did not act abruptly. How do we know? How do we know? How do we know that there was no objection? And how do we know that there was nobody saying, let's deliberate further? I mean, you've offered us. You've offered us. We know that. We're sorry. We know that because, and the statements made at the hearing by judge, sorry, by McChain, counsel for Garcia, counsel for Young, they don't say that. Seems to me, if in fact they objected, they'd be telling the judge, we objected. It seems to me, if in fact they objected, they would be here saying, I objected. Doesn't there have to be a discussion on the record of alternatives? Because the idea of necessity is something that, you know, there has to be some affirmative discussion of what's going on. Some way in which we can presume that silence means consent. We don't have anything of record here. Well, I think your decision in law B, Morton, only requires that there be an opportunity to object that's adequate and a failure to object. And the government's position is that is what happened here. In other words, we would take the position. Do we have any ground for assurance that the lawyers present have been in touch with all of their clients? No, we don't. But I would submit to this court that the court never has. I mean, that is an issue that the defendant should raise and any defendant could raise at any time. And if the court was to give credence to that position, this court would be saying that whenever a lawyer gets up in front of a court and says, judge, we have no objection. Let's say it was done like that to a mistrial. The court now has an obligation to go behind that and inquire, well, by the way, counsel, did you clarify that with your client? Well, of course, it was done in chambers, so it wasn't within the hearing of the defendant. So we know that whatever communication there was, the defendant did not have access to in the judge's chambers. Secondly, we have Judge Finch saying that he didn't comply with Rule 26.3. Isn't that pretty telling? Well, yes and no. First of all, the ruling that you're referring to has not been vacated. Well, after he recused himself. Well, I'm going to get to that. He never actually recused himself from that case. But I get to that. But how is the ruling not a problem? And doesn't it dispute the very proffer? No. I'm going to tell you why. Because if you read the ruling carefully, what he says is he recites the rule. And then he says, there appears to have been no compliance with the rule on the record. All right. We agree with that. We don't dispute that on the record, which is what they're supposed to do, hiding behind the record. How can we accept things that happen off the record? As a court of law, how can determinations be made based upon essentially hearsay? I think a court can make determinations based upon what is supported on the record. And what do you have that's on the record? You have the government's proffer that nobody objected to. The proffer's not on the record. The proffer's not on. I mean, there's a piece of paper that's been filed. But what it says is not a matter of record that it happened. It's basically hearsay. That is true. But I'm saying if the government filed that piece of paper and asked the court to consider these as facts, and there is no opposition to it, I think a court can make a finding with respect to that. And that is what Judge Thompson did. It says what people said and didn't say. And from that standpoint, it's hearsay. And its reliability is questionable. Well, it's one thing to say it's not admissible. It's a different thing to say what weight you give to it. And the government's position is that it ought to be given some weight because... Well, first it has to be admissible. And I've been out of the district court a while, so I'm going to probably defer to Judge Pollack on it. Well, I think that the court... There is such a rule, isn't there? You think? I think so. In our district, yeah. Well, I see my time is up, so I'll ask for permission to conclude. All right. Anything further? Why don't you conclude? Thank you. Very well. I'll ask the court to consider its decision in Wood v. Zapata. It's cited on page 37, 38 of my brief. This court actually upheld a district court's reliance on an unrecorded in-chambers conference to issue a transfer order. Which case are you citing? It's Wood v. Zapata. It's on page 37, 38 of my brief. And for other reasons, I also mentioned in my brief, I'll ask the court to... 37. Yeah. To uphold the magistrate declaration and to affirm the district court's denial of the defendant's motion to dismiss. Thank you, Counselor. Do I still have two minutes? Yes, I believe you do. Yes, you're reserved two. That's fine. I think because we have so many issues in this case, strong issues, that we're kind of overlooking the basic, most basic one. And we're putting the cart before the horse. Because in this case, this case isn't a case of manifest necessity. We don't even have simply... Let me back up. The mistrial that was declared in this case was simply unnecessary, let alone manifestly necessary. And I say that to say this, Your Honor. Way back from the United States v. Perez, the Supreme Court in 1824 stated that the failure of a jury to reach unanimous verdict is traditional basis for manifest necessity for declaring a mistrial. The problem we have here, Judge, is that we never heard from the jury. And the appellants, the defendants, were deprived the right to a trial by jury. What they received up until July... What they received up until end of trial was a trial by jury. After that, it was a trial by jury formally. Because the jury was never polled. And that's very, very important. I would be remiss if I left Philadelphia and not mention to the court, remind the court, that Third Circuit Court of Appeals is the only circuit in this country that requires that the judge check with the entire panel, not just the jury form. And that's the Webb case, Your Honor. And the Webb case is still good law. It goes back to 1975. And in that case, it's very similar to that. And I quoted it in page 19. Where it's very similar that the trial judge directed his interrogatories only to the jury form, just like in this case. And as far as the record reveals, the form alone indicated a response. And this is for page 19 of my brief. The other members of the panel, just like in this case, were in the box at the time. And it would conceivably have been possible for another juror who disagreed with the former's assessment of the jury's status to make his opinions known to the court. Jump up like in a fish market. However, unanimous consent cannot be inferred from a silent record. And that's what we have here, Your Honor. We have the 11 jurors in the jury, the 11 other jurors sitting there watching, respecting the court as the attorneys are, not jumping out and shouting out as if it's an auction or buying fish. Quote, it may be, however, it may be, as Judge Weiss asserts, that many citizens if placed on this jury would have voiced any disagreement they may have had with the opinion expressed by the foreman. There has been no empirical showing, however, that all jurors are so self-assertive as are attorneys. It is at least, that was my part, that's not the quote. It is at least possible that one or more of the jurors here stood sufficiently swayed by the court's demand for oral proceedings that they were deterred from making unsolicited comments on the jury's progress. Thus, there is no clear showing that the foreman's responses here necessarily represented the unanimous opinion of the jury or even that of a majority of the panel. And that's what we have here. All of the other circuits are different to the Third Circuit, every last one. They take the word of the jury foreman as opposed to checking to see if his unverified responses are accurate. And that's really watering down the right to a trial by jury. It really is, and I'm really surprised none of the other circuits take that approach. I would hope that this court would uphold Webb, not overrule Webb. And just like it didn't Webb, because the rest of the jurors were not questioned by the judge, and just because the other jurors didn't jump out and say that's not what was going on in there. We don't know if the jury foreman has a Type A personality or a Type Z. Counsel, let me ask a question about consent. We have some indication that there was a conference in chambers. Yes. And right after that, the court declared a mistrial. Yes. It seems to me that in order to find consent, we need to find an opportunity for exchange of alternatives and opportunity to address the issue of whether a mistrial should be granted. And then a failure to object. Why do we not have that here? Because Love v. U.S. requires that it be a reasonable opportunity. In United States v. Lovett, very similar to this case where the judge came back from a lunch recess, complained about errors that occurred during the trial, and declared a mistrial just as fast as I just spoke. But this is a case where you had some conference, we don't know exactly what, but you conceded that at least mistrial was being thrown around. No doubt. It could get you thinking about it. Yes, exactly. But as a trial lawyer, judge, you have to wait until the judge comes back to see if he changed his mind. But it wasn't out of surprise, though. It wasn't out of nowhere. It was in Love. No, I will not say that as an officer of the court. He handed us the note, and the note did say, presently deadlocked, not hopelessly deadlocked. My time is up, but I want to suggest this. This case screams, I don't want to give the court any more work to do. This court screams at the necessity of establishing a jury handbook. Because you have all these questions that come up in situations like this. How about an attorney handbook? I know, yeah. The 9th Circuit has one, and I now have to cite the 9th Circuit. Rule 101, ask the judge to poll the jury. But, you know, I mentioned on page 21 of my brief what the 9th Circuit does. They actually have a handbook, and we had a handbook in the 3rd Circuit. We would ask questions like, is there anything else the court can do to assess the jury deliberations? Well, I think it's really up to the judge and the lawyers to figure out how to handle the jury. We will take that under advisement along with the case. We will cut down a lot of the cases that come before the court. We had another one that versioned off last Monday that stayed. We had Uras v. Perez in 2002. So we'll cut down and we'll help judicial economy. Well, I think if counsel would just say, Your Honor, will you please poll the jury, it would be helpful. Counsel, thank you. We appreciate your coming to argue before us. It's been most helpful. It's an important case, and we will take it under advisement. Thank you so much. We'll ask the clerk to recess the court.